## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ANTHONY GENNARO, JR., on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL RESEARCH CORPORATION, MICHAEL D. HAYS, JOANN M. MARTIN, BARBARA J. MOWRY, JOHN N. NUNNELLY, and DONALD M. BERWICK, <br><br> Defendants. | Case No. |

## VERFIED CLASS ACTION COMPLAINT

Plaintiff Anthony Gennaro, Jr. ("Plaintiff"), by the undersigned attorneys, submits this this Verified Shareholder Class Action Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## INTRODUCTION

1.    This shareholder class action challenges the conflicted and self-serving recapitalization plan orchestrated by Defendant Michael D. Hays ("Hays"), the founder, Chief Executive Officer ("CEO"), and controlling stockholder of National Research Corporation ("NRC" or the "Company"), to forcibly cash-out all holders of NRC's Class B common stock, except for himself, at an inadequate and improper price, with the intent and effect of solidifying Hays' iron grip on control of the Company.

2.    The proposed transaction, if consummated, will allow Hays to be the only stockholder to maintain for himself preferential dividend rights worth six times the dividends to

which other stockholders will be entitled.  In addition, despite the fact that he will own only 33% of the economic interests in the Company, Hays will increase his voting control of the Company from 54% to approximately 92% as a result of the Class B stock's 100x voting rights. Consequently, the Proposed Transaction will give Hays absolute power to control all of the Company's affairs and allow him to dispose of a large portion of his remaining economic interest in the Company without sacrificing control.

3.      Further, as alleged in detail herein, if consummated the Proposed Transaction will violate the Wisconsin Business Corporation Law ("WBCL"), which governs the Company because NRC is incorporated in Wisconsin, as well as Article 9 of the Company's Articles of Incorporation.

4.      The mechanics of the proposed transaction will operate as follows: (1) NRC will effect a 1-for-1,764,560 reverse stock split of its Class B common stock; (2) after the reverse split, each Class B stockholder who holds less than one full share of Class B common stock -- which is mathematically guaranteed to include all Class B stockholders except Hays -- will receive $53.44 in cash for each share of Class B common stock they held immediately prior to the reverse stock split and will no longer be a holder of Class B common stock; (3) the vesting of all outstanding stock options to purchase Class B common stock will be accelerated and each option will be redeemed for an amount of cash equal to the difference between $53.44 and the options' exercise price; and (4) following the completion of the reverse split, the Company will effect a 1,764,560-for-1 forward stock split of the remaining one share of Class B common stock held by Hays (collectively, the "Proposed Transaction").  As a result of the Proposed Transaction, Hays will be the sole remaining holder of Class B common stock, with its outsized dividend and voting rights, and he will also receive $208,000 in cash as a result of the cashing out of his Class B common stock options.  The 1,764,560 figure for the reverse and forward split was chosen specifically so

that Hays will be the only stockholder to hold one full Class B share after the reverse split, and it will allow him to retain the same number of Class B shares after the Proposed Transaction as he held before the transaction.

5.      The Class B shareholders unaffiliated with Hays are thus being forcibly expelled from the Company at an inadequate price of $53.44 per Class B share.  This per share amount is wholly inadequate to compensate the Class B stockholders for the forcible redemption of their shares.  The Company's Class B stock price has been on an upward trajectory over the last year, and was trading as high as $57 in mid-August 2017.  Further, the Company's Board of Directors (the "Board") inexcusably, and in breach of their fiduciary duties, conducted no financial analysis to ascertain the value of the Class B common stock and opted to give the Class B stockholders no premium to compensate them for the Company's future prospects they will be forced to forego.

6.      Although the Proposed Transaction is nominally being put to a vote of all stockholders, the Board refused to condition approval of the Proposed Transaction on the affirmative approval of the majority of stockholders unaffiliated with Hays, who controls a majority of the Company's stockholder voting power.  Consequently, regardless of how other stockholders vote, Hays can and will approve the Proposed Transactions through his votes alone because the Board consciously made the decision to give the unaffiliated stockholders absolutely no say in whether to accept the terms of the Proposed Transaction, including the $53.44 price.

7.      The Proposed Transaction is the result of a conflict-ridden process orchestrated by Hays and designed to provide him with preferential treatment at the expense of the unaffiliated stockholders.  As alleged in detail herein, the Board took no measures to even attempt to ameliorate the conflicted process which culminated in the Proposed Transaction.  Hays spearheaded the discussions with the Board and fully participated in the meetings in which the Proposed

Transaction was discussed.  The Board formed no committee of independent directors to negotiate the Proposed Transaction, nor was the transaction conditioned on the approval and recommendation of such a committee.  Instead, the Board's approval proceeded as if the Board were completely unaware of or unconcerned about the inherent conflicts of interest the Proposed Transaction posed and the favorable treatment Hays would receive.

8.     The special meeting for shareholders to vote on the Proposed Transaction is tentatively scheduled to be held on a to-be-specified date in November 2017.    On October 30, 2017, the Company issued a Preliminary Proxy Statement in connection with the special meeting (the "Proxy").

9.     The Board was wholly uninformed in its approval and recommendation of the Proposed Transaction.  By failing to hire a financial advisor to evaluate the value of the Class B common stock and deliver a fairness opinion, the Board was not, and could not have possibly been, adequately informed in arbitrarily selecting $53.44 as the cash-out price for the Class B shares.

10.     Plaintiff brings this action to remedy defendants' misconduct and seeks, among other things, a preliminary and permanent injunction prohibiting defendants from consummating the Proposed Transaction.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

12.     The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper under 28 U.S.C. § 1391 in this District as a substantial part of the acts and omissions giving rise to the claims in this action occurred in this District, and certain of the Defendants reside in and/or have their principal place of business within this District.

## THE PARTIES

14.     Plaintiff is currently a Class B stockholder of NRC, was a Class B stockholder of NRC at the time of the wrongdoing alleged herein, and has been a Class B stockholder of NRC continuously since that time.  Plaintiff is a citizen of Indiana.

15.     Defendant NRC is a Wisconsin corporation that maintains its principal place of business in Lincoln, Nebraska, and therefore is a citizen of Wisconsin and Nebraska.  Hays founded NRC as a Nebraska corporation in 1981.  The Company subsequently reincorporated in Wisconsin in September 1997.  NRC has two classes of common stock, Class A and Class B, that each trade publicly on the NASDAQ exchange under the ticker symbols "NRCIA" and "NRCIB", respectively.  According to its public filings, NRC is a provider of analytics and information to health care providers to enable them to understand the experiences of health care consumers and design their services to best meet their customers' needs.

16.     Defendant Hays is the founder, CEO, and a director of the Company.  He also served as President of the Company from 1981 to 2004 and again from July 2008 to July 2011. Hays is the controlling stockholder of NRC, presently controlling approximately 56% of the outstanding Class B stock and approximately 26% of the outstanding Class A stock (27.6% when including shares owned by a Hays family trust), collectively constituting approximately 54% of the Company's total stockholder voting power.  As a result of Hays' control of the Company, he has the power to decide who sits on the Board, was able to orchestrate the Proposed Transaction for his own benefit, and has interests that differ from the unaffiliated stockholders.  Hays will personally benefit from the Proposed Transaction as a result of the disparate treatment he will

5

receive.  He will remain the sole Class B stockholder, and his Class B shares will entitle him to 6x the dividend rights and 100x the voting rights of any other remaining stockholder.  The Proposed Transaction will allow him to seize nearly an additional 40% of the Company's stockholder voting power that he would not otherwise have.  Hays is a citizen of Nebraska.

17.     Defendant JoAnn Martin ("Martin") has been a director of the Company since 2001 and approved and recommended the Proposed Transaction.  Martin is a citizen of Nebraska.

18.     Defendant Barbara J. Mowry ("Mowry") has been a director of the Company since 2014 and approved and recommended the Proposed Transaction.  Mowry is a citizen of Colorado.

19.     Defendant John N. Nunnelly ("Nunnelly") has been a director of the Company since 1997 and approved and recommended the Proposed Transaction.  Nunnelly is a citizen of Massachusetts.

20.     Defendant Donald M. Berwick ("Berwick") has been a director of the Company since 2015 and approved and recommended the Proposed Transaction.  Berwick is a citizen of Massachusetts.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and its Capital Structure**

21.     In 1981 Hays founded NRC as a Nebraska corporation.  In September 1997, the Company was reincorporated in Wisconsin, but its headquarters remained in Nebraska.  The Company's initial public offering occurred in October 1997, and Hays has been the controlling stockholder of the Company at all times.  Hays has also served as CEO of the Company since 1981.

22.     Prior to 2013, the Company had only one class of publicly traded common stock. However, at the behest of Hays, in 2013 the Board approved a recapitalization of its common stock into two classes, Class A and Class B (the "2013 Reclassification").  The 2013 Reclassification

was approved by the stockholders of the Company at the May 2013 annual meeting of stockholders, but stockholder approval was a foregone conclusion because Hays controlled a majority of stockholder voting power.

23.     The 2013 Reclassification established two new classes of common stock to replace the previous single class of common stock.  The newly established Class A common stock carried $1/100^{th}$ of a vote per share, whereas the newly established Class B common stock carried one full vote per share.  With respect to dividend rights, the Class A common stock carried the right to receive $1/6^{th}$ of the per share dividend, if any, paid on the Class B common stock.  Therefore, the Class B common stock carried 6x the dividend rights of the Class A stock and 100x the voting rights of the Class A stock.

24.     The 2013 Reclassification was effected through a dividend and reclassification structure whereby the Company issued each stockholder a dividend of three shares of Class A common stock for each share of the Company's then-existing common stock held, and then reclassified each share of the then-existing common stock into one-half of one share of new Class B common stock.

25.     After the 2013 Reclassification, Hays controlled approximately 26.5% of the Class A common stock (27.7% when including shares owned by a Hays family trust) and 57.7% of the Class B common stock, collectively accounting for approximately 52% of the Company's overall stockholder voting power.  Since that time, his control has increased to approximately 54% of the total voting power.

26.     As of February 17, 2017, there were approximately 16 shareholders of record and approximately 1,224 beneficial owners of the Class A Stock and approximately 14 shareholders of record and approximately 1,157 beneficial owners of the Class B Stock.  Presently, there are

approximately 20,942,785 shares of Class A common stock outstanding and approximately 3,540,244 shares of Class B common stock outstanding.  Due to its preferential voting rights, the Class B stockholders wield approximately 94% of NRC's total stockholder voting power, a majority of which is controlled by Hays.

**Hays Decides to "Undo" the 2013 Reclassification for His Own Benefit**

27.     The purported purpose of the 2013 Reclassification was to increase liquidity in the Company's publicly traded common stock, expand the Company's institutional ownership base, and enhance shareholder value and flexibility.

28.     Unsurprisingly, those purportedly desired effects were never achieved.  Instead, the Company's publicly traded common stock has endured persistently low trading volumes, and a significant trading price disparity has developed between the Class A stock and the Class B stock.  As a result, the Company has received negative shareholder feedback with respect to the dual-class stock structure.

29.     In late 2015, the Board purportedly began discussing various methods to address the illiquidity in the Company's two classes of stock and the "confusion in the public market over [its] dual class common stock structure."  At that time, Hays led efforts on behalf of the Board and Company to evaluate alternatives to address these concerns.

**The Conflicted Process Begins to Unfold**

30.     Between January 2017 and September 2017, the Board purportedly met various times to discuss the alternatives that were on the table.  The Proxy recounts that sometime in late April or early May, by which time the Board had purportedly determined to focus on pursuing a transaction that would result in a single class of NRC common stock, Hays indicated to the Board

that he would be "willing" to be excluded from a reverse split of the Class B stock and continue to hold illiquid Class B shares so long as a forward stock split was also implemented.

31.     Despite the fact that under Hays' proposal his interests would diverge from those of the unaffiliated stockholders, the Board did nothing to address the obvious conflicts of interest. Instead, the Board unjustifiably determined not to form a special committee of independent directors to negotiate with Hays on behalf of the minority stockholders and inexplicably continued to allow Hays to substantially lead the Board discussions relating to the Proposed Transaction. Hays was present for and participated in no less than seven meetings at which the Board discussed the Proposed Transaction. Hays selected which strategy the Board would pursue to address the concerns with NRC's dual-class structure, participated throughout the discussion process, and participated in the meeting at which the Board determined not to condition the Proposed Transaction on approval by a majority of the minority stockholders. Moreover, the Proxy does not indicate that Hays abstained from the final Board vote to approve the Proposed Transaction.

32.     Hays and the Board purportedly evaluated six separate strategic alternatives that NRC could pursue in addition to the Proposed Transaction. They were (1) a conversion of one class of stock into the other class; (2) a sale of the Company; (3) a take-private transaction funded by either debt or a private equity investment; (4) a tender offer for all shares of Class B stock (excluding Hays); (5) a cash-out of all of the Class A or Class B common stock, including Hays' shares; and (6) a status-quo alternative.

33.     According to the Proxy, options (1), (2), and (3) were quickly dismissed. The conversion option was rejected as purportedly banned under NASDAQ rules, though that conclusion is at best questionable, if not outright wrong. A sale of the Company was a non-starter for Hays, who also rejected a "going-private" transaction, so those were also not serious

alternatives. Therefore, other than maintaining the status quo and doing nothing, the Board only considered two truly plausible alternatives to the Proposed Transaction: a tender offer for the Class B stock (excluding Hays), and a cash out of either the Class A or Class B stock (including Hays).

34. The tender offer option would have been similar to the Proposed Transaction, but it would have allowed the minority Class B stockholders to choose for themselves whether the cash-out price was fair or whether they instead wished to retain their shares of Class B stock. Hays and the Board would not allow that. The Proxy asserts that the tender offer option would have been "unpredictable" as to whether enough Class B holders would tender their shares to allow the Company to delist the Class B stock from NASDAQ, which Hays and the Board wished to do.

35. The cash out of one full class of common stock also would have been similar to the Proposed Transaction, except it would have treated all holders, including Hays, equally. Yet Hays and the Board somehow decided it was in the best interests of the Company and its stockholders for Hays -- and only Hays -- to retain his Class B holdings, and therefore his 6x dividend and 100x voting rights, which would increase his voting control of the Company from 54% to 92%.

36. Allowing Hays to steer the process and evaluation of alternatives in a conflicted transaction where his interests were divergent from those of the minority stockholders was simply improper and in breach of the Board's fiduciary duties. Under such circumstances, it is unsurprising that the outcome of the process yielded a Proposed Transaction that unduly benefits Hays at the expense of the minority stockholders unaffiliated with him.

37. The Proxy further indicates that in the middle of the process, on August 11, 2017, the Audit Committee of the Board "reimbursed" Hays in the amount of $538,000 for certain expenses he purportedly incurred in connection with exploring the foregoing strategic alternatives

for the Company.  The Proxy gives no further description of what expenses Hays personally incurred.

**The Board Approves a Transaction that Will Disproportionately Benefit Hays at the Expense of the Minority Stockholders**

38.     On September 15, 2017, the Board approved the Proposed Transaction, including the cash-out price for the shares of Class B common stock not owned by Hays.  The Proxy indicates that the Board received no financial analysis of the Class B stock's valuation and no fairness opinion from an independent financial advisor opining on the fairness of the Proposed Transaction to the minority stockholders.  On September 18, 2017, NRC announced the Proposed Transaction and filed a preliminary proxy statement with the SEC.

39.     The Proposed Transaction blatantly treats Hays, a corporate insider and the Company's controlling stockholder, far more favorably than the minority stockholders.  Upon consummation of the Proposed Transaction, Hays will become the sole holder of Class B common stock, which will make Hays the only stockholder entitled to receive preferential 6x dividend rights and 100x voting rights.  It will also result in Hays' increasing his voting control of the Company from 54% to approximately 92%.

40.     The massive increase in Hays' voting power is significant.  Although Hays is already the Company's controlling stockholder, his power is still limited by certain sections of the Company's Amended and Restated Articles of Incorporation (the "Charter") and its By-Laws.  For example, the Company's current Charter requires an affirmative vote of two-thirds of outstanding shares to amend Articles 3, 9, and 10 of the Charter, which govern the powers, number, tenure, and removal of directors; business combinations with interested stockholders; and takeover and merger voting procedures, respectively.  The same is true for Sections 3.01 and 3.02 of the By-Laws, which govern the powers and number of directors and director tenure and qualification

requirements, respectively.  Upon consummation of the Proposed Transaction, Hays will have the sole ability to amend or repeal those sections (and all others) of the Charter and By-Laws, making him answerable to nobody, despite the fact that he will only own approximately 33% of the economic interests in the Company.  Hence, the Proposed Transaction will give Hays virtually absolute power over the affairs and governance of the Company.

41.     The Proposed Transaction will also give the unaffiliated Class B stockholders inadequate compensation for their Class B stock.  According to the Proxy, the $53.44 cash-out price is based on the volume weighted average price ("VWAP") at which the Class B shares traded on September 15, 2017, the day before the Proposed Transaction was announced.  This method for valuing the Class B common stock – based on a single day's trading price – is egregiously improper and unfair.  As a matter of course, companies cashing out stockholders in the context of mergers and acquisitions employ financial advisors who routinely engage in detailed analyses to determine a stock's true fair value.  These analyses typically involve several valuation methods, including discounted cash-flow analysis, precedent transaction analysis, peer company trading analysis, sum-of-the-parts analysis, and/or other valuation methods.  A range of prices is ascertained from each analysis, and those ranges are compared and weighed against each other to determine with as much certainty as possible the genuine fair value of the stock.  Only with this type of information can a board of directors make an informed decision as to a stock's true value for purposes of cashing out minority holders.

42.     The Board eschewed any such analyses and instead hired the firm Emory & Co. ("Emory") to make a single presentation on the "possible alternatives for determining the fair value of the shares of class B common stock to be cashed out."  Emory merely identified various ways the Board could determine the Class B shares' value, which the Proxy identifies as: (1) the closing

4:17-cv-00441-JMG-MDN   Doc # 1   Filed: 11/15/17   Page 13 of 24 - Page ID # 13

price of the Class B common stock on the day the transaction was announced; (2) the average of the high and low Class B common stock prices on the day of announcement; (3) the VWAP of the Class B common stock on the day of announcement; (4) the highest trading price of the Class B common stock over the previous 52 weeks; (5) an average (weighted average or otherwise) of the sales or closing prices of the Class B common stock for some number of recent trading days, (6) a hybrid of any of the foregoing methods, such as the greater of one or the other; (7) a discount to recent trading prices or average price of the Class B common stock; or (8) a premium to recent trading prices or average price of the class B common stock.  The Proxy does not indicate that Emory made any recommendation as to which of these elementary options the Board should choose, nor did it perform any financial analysis of the Company to determine the fair value of the Class B stock, as is typically done in comparable situations.

43.    As a result of the Board's deliberate failure to obtain even a rudimentary analysis of the fair value of the Class B stock, the Class B stockholders will receive absolutely no premium for being forcibly cashed-out of the Company and thereby deprived of the growth prospects that only Hays and the Class A stockholders will enjoy.  This is particularly troubling in light of the upward trajectory that NRC and its stock prices have enjoyed over the last year as the Company has performed well.  For example, in the 52 weeks preceding the announcement of the Proposed Transaction, the Company's Class B stock price climbed from a low of $34.63 to a high of $57.04 as recently as August 15, 2017.  In early-August of this year the Company published quarterly earnings reporting a 9% increase in revenue and a 25% increase in net income.  Failing to compensate the Class B stockholders for the upward trajectory of the Company's stock price renders the cash-out price unfair.

44.     Additionally, the unaffiliated Class A stockholders that will remain shareholders of the Company will be harmed as a result of Hays' increasing the divergence between his voting control and his economic ownership.  Currently, Hays owns approximately 30% of the total outstanding shares of Company common stock and wields 54% voting control of the Company.  After consummation of the Proposed Transaction, Hays will own approximately 33% of the outstanding Company equity but wield 92% voting control over the Company.  This drastic increase in voting control and associated increase in the wedge between Hays' control and ownership of the Company will harm the minority stockholders.

45.     Public markets typically value controlled companies at a discount to non-controlled companies.  The Proposed Transaction will not only perpetuate NRC's controlled status, but will in fact tighten Hays' grip on the Company's affairs as a result of his exclusive retention of Class B stock.  Once Hays eliminates all Class B stock other than his own, and controls 92% of the Company's voting power, the minority stockholders, despite their owning  approximately 67% of NRC's equity, will never realize the benefit of obtaining majority voting control of NRC and will never be able to exercise any influence over the Company's affairs.

46.     The Proposed Transaction will thus allow Hays to steal an additional 40% in NRC voting power without paying anything in return to the numeric majority (but voting minority) of stockholders.  Further, Hays will be in position to dispose of all of his Class A holdings, bringing his equity ownership down to approximately 8%, without losing voting control of the Company.

**The Proposed Transaction Violates Article 9 of the Company's Charter and WBCL § 1141(2)**

47.     Section 1141 of the WBCL, Wis. Stat. § 180.1141, prohibits a Wisconsin corporation from engaging in a "business combination" transaction with an "interested stockholder," as those terms are defined in the statute, unless certain conditions are satisfied.

14

48.     WBCL § 1140(8)(a), Wis. Stat. § 180.1140(8)(a), defines an "interested stockholder" as one who holds more than 10% of the corporation's outstanding stock, and thus Hays is an "interested stockholder" under the statute.

49.     WBCL § 1140(4)(e), Wis. Stat. § 180.1140(4)(e), defines a "Business Combination" to include:

> **Any of the following, if the direct or indirect effect is to increase the proportionate share of the outstanding stock of a class** or series or securities convertible into voting stock of the resident domestic corporation or a subsidiary of the resident domestic corporation **beneficially owned by the interested stockholder** or an affiliate or associate of the interested stockholder, unless the increase is the result of immaterial changes due to fractional share adjustments:
>
> **1.  A reclassification of securities, including, without limitation, a stock split, stock dividend or other distribution of stock in respect of stock, or reverse stock split.**
>
> **2.  A recapitalization of the resident domestic corporation.**
>
> 3.  A merger or share exchange of the resident domestic corporation with a subsidiary of the resident domestic corporation.
>
> **4.  Any other transaction, whether or not with, into or involving the interested stockholder, which is proposed by, on behalf of, or pursuant to a written or unwritten agreement, arrangement or understanding with, the interested stockholder or an affiliate or associate of the interested stockholder.**

Wis. Stat. § 180.1140(4)(e) (emphasis added).  The Proposed Transaction qualifies as a business combination pursuant to subsections (1), (2), and (4).

50.     WBCL § 1141(2), Wis. Stat. § 180.1141(2), prohibits "business combinations" with "interested stockholders" unless:

> (a) The board of directors of the resident domestic corporation has approved, **before the interested stockholder's stock acquisition date**, the purchase of stock made by the interested stockholder on that stock acquisition date;

(b) The business combination is **approved by the affirmative vote of the holders of a majority of the voting stock not beneficially owned by the interested stockholder** at a meeting called for that purpose; or

(c) The business combination meets **all** of the following conditions:

> 1. **Holders of all outstanding shares of stock of the resident domestic corporation not beneficially owned by the interested stockholder are each entitled to receive** per share an aggregate amount of cash and the market value, as of the consummation date, of noncash consideration at least equal to the higher of the following:

>> a. **The highest of: the market value per share on the announcement date** with respect to the business combination, the market value per share on the interested stockholder's stock acquisition date, the highest price per share paid by the interested stockholder, including brokerage commissions, transfer taxes and soliciting dealers' fees, for shares of the same class or series within the 3 years immediately before and including the announcement date of the business combination, or the highest price per share paid by the interested stockholder, including brokerage commissions, transfer taxes and soliciting dealers' fees, for shares of the same class or series within the 3 years immediately before and including the interested stockholder's stock acquisition date; **plus, in each case, interest compounded annually from the earliest date on which that highest per share acquisition price was paid or the per share market value was determined, through the consummation date, at the rate for one-year U.S. treasury obligations from time to time in effect**; less the aggregate amount of any cash and the market value, as of the dividend payment date, of any noncash dividends paid per share since that date, up to the amount of that interest.

>> b. The highest preferential amount per share, if any, to which the holders of shares of that class or series of stock are entitled upon the voluntary or involuntary liquidation of the resident domestic corporation, plus the aggregate amount of dividends declared or due which those holders are entitled to before payment of dividends on another class or series of stock, unless the aggregate amount of those dividends is included in the preferential amount.

> 2. The form of consideration to be received by holders of each particular class or series of outstanding stock in the business combination is in cash or, if the interested stockholder previously acquired shares of that class or series, the same form as the interested stockholder previously used to acquire the largest number of shares of that class or series.

Wis. Stat. § 180.1141(2) (emphasis added).

51.     The Proposed Transaction cannot possibly satisfy the requirements of subsection (a) because Hays acquired NRC stock when he founded the Company in 1981, and therefore his acquisition of Company stock was not subject to Board approval.

52.     The Proposed Transaction does not satisfy the requirements of subsection (b) because the Board decided not to put the Proposed Transaction to a vote of the minority stockholders unaffiliated with Hays.

53.     The Proposed Transaction does not satisfy the requirements of subsection (c) because the Class B stockholders who are being cashed out are not receiving the statutorily mandated minimum compensation, which is the "market value per share on the announcement date with respect to the business combination."

54.     WBCL § 1142(a)(1), Wis. Stat.  § 180.1142(a)(1), defines "market value" as:

> **The highest closing sale price during the 30 days immediately before the date in question of a share of that class or series of stock** on the composite tape for stocks listed on the New York stock exchange, or, if that class or series of stock is not quoted on the composite tape or if that class or series of stock is not listed on the New York stock exchange, on the principal U.S. securities exchange registered under the exchange act on which that class or series of stock is listed

Wis. Stat. § 180.1142(a)(1) (emphasis added).

55.     The highest closing sale price of Class B stock during the 30 days immediately before the date the Proposed Transaction was announced was $55.60, the price at which Class B stock closed on September 13, 2017.  Accordingly, $55.60 is the statutorily defined "market value" of Class B stock, but the cash out price is only $53.44, $2.16 less than the statutorily mandated minimum (not including interest).

56.     Because it satisfies none of the exceptions set forth in WBCL § 1141(2), the Proposed Transaction is statutorily prohibited and cannot be consummated.

57.     Pursuant to the WBCL, NRC could have "opted out" of §§ 1140 – 1142, but instead the Company "opted in" by incorporating the text of these statutory sections nearly verbatim in Article 9 of the Company's Charter.  Therefore, consummation of the Proposed Transaction would violate both the WBCL and the Company's Charter.

**The Directors' Breaches of Fiduciary Duty**

58.     As directors of NRC, defendants Hays, Martin, Mowry, Nunnelly, and Berwick owed the Company's shareholders the fiduciary duties of care, loyalty, and good faith.  By failing to address the conflicts of interest described herein, and by embarking on a defective process that was spearheaded by Hays and favored his interests, these Defendants acted in violation of their fiduciary obligations in multiple ways.

59.     The Board failed to form a committee of independent of directors to negotiate the Proposed Transaction on behalf of the unaffiliated stockholders once it became clear that Hays wished to be treated disparately in the transaction.  Instead, the process was permeated with Hays' conflict of interest, as the Board allowed Hays to drive the strategic review process and meet in conjunction with the Board to plan the Proposed Transaction.  Because of this deficient process, Hays was able to orchestrate a transaction that would give him significant unique benefits at the expense of the minority stockholders, as described herein.

60.     The Board also failed to seriously consider viable alternatives to the Proposed Transaction that would have treated all stockholders, including Hays, equally.  Instead, the Board sat back and allowed Hays to push through his preferred transaction structure, which benefitted him at the expense of the minority stockholders.

61.     The Board also failed to obtain a financial analysis of the fair value of the Class B common stock.  According to the Proxy, the Board did essentially nothing to ensure that the compensation paid to the Class B stockholders for their shares was a fair value for being cashed out of the Company completely.  The Board performed no evaluation of the inherent value of the shares nor any valuation of the future prospects of the Company to compensate Class B stockholders for any potential increase in the value of the Company of which they would be deprived.

62.     The Board also failed to give the unaffiliated stockholders any voice with respect to the Proposed Transaction.  The Board explicitly determined not to condition the Proposed Transaction on the approval of the majority of shares unaffiliated with Hays and declined to grant the Class B holders anything similar to a right of appraisal for their stock.  Instead, the inadequate $53.44 consideration will be forced on the Class B stockholders as a result of Hays' ability to approve the Proposed Transaction himself, leaving the Class B stockholders with no recourse to obtain fair value for their shares.

63.     The Board also approved a transaction that violates the WBCL and the Company's Charter.

64.     All of defendants' Hays, Martin, Mowry, Nunnelly, and Berwick's foregoing conduct was in breach of their fiduciary duties.

65.     Adding insult to injury, the directors will be unjustly enriched through their receipt of cash payments totaling more than $2.5 million for their Class B stock options through accelerated vesting and cashing out of those options, as follows:

| | |
|---|---|
| Hays | $208,331 |
| Martin | $619,020 |
| Mowry | $375,780 |
| Nunnelly | $1,039,680 |
| Berwick | $275,880 |
| **TOTAL** | **$2,518,691** |

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this class action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of all holders of Class A and Class B common stock of NRC who are being and will be harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation, or any other entity related or affiliated with any Defendants.

67.     This action is properly maintainable as a class action.

68.     The Class is so numerous that joinder of all members is impracticable.  According to NRC filings, there are over 3.5 million shares of Class B common stock outstanding and over 20 million shares of Class A common stock outstanding.  As of February 17, 2017, there were approximately 16 shareholders of record and approximately 1,224 beneficial owners of the Class A Stock and approximately 14 shareholders of record and approximately 1,157 beneficial owners of the Class B Stock.

69.     There are common questions of fact and law including, *inter alia*, the following:

(i)     Whether the Defendants have breached and continue to breach their fiduciary duties owed to all stockholders by favoring the interests of Hays at the expense of the interests of NRC's   minority stockholders;

(ii)     Whether Hays breached his fiduciary duties as the controlling stockholder of NRC by demanding disparate treatment in the Proposed Transaction to facilitate his personal interest in maintaining preferred dividend rights and voting control of the Company; and

(iii)   Whether Plaintiff and the Class are entitled to injunctive relief and/or damages.

70.   Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff does not have any interests adverse to the Class.

71.   Plaintiff is an adequate representative of the Class, has retained skilled counsel with extensive experience in litigation of this nature, and will fairly and adequately protect the interests of the Class.

72.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

73.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Breach of Fiduciary Duties
### Against Hays, Martin, Mowry, Nunnelly, and Berwick

74.   Plaintiff repeats and re-alleges each allegation set forth in this Complaint.

75.   By virtue of their positions as directors of NRC, defendants  Hays, Martin, Mowry, Nunnelly, and Berwick owe fiduciary duties to the Company's stockholders and must act with due care, loyalty and good faith in the performance of their functions as directors.

76.   Defendants Hays, Martin, Mowry, Nunnelly, and Berwick breached their fiduciary duties in connection with the Proposed Transaction.

77.   In approving the Proposed Transaction, the foregoing defendants made no good faith effort to take effective steps to protect the interests of the Company's minority stockholders. The discussions leading up to the Proposed Transaction were not at arm's-length, but instead

constituted a conflicted process led by Hays, who intended to and did structure the transaction for his own benefit.  The other directors took no action to mitigate the conflicted process or the disparate treatment that Hays would receive in the Proposed Transaction, which would benefit him at the expense of the minority stockholders.

78.     The foregoing defendants similarly took no action to make a good faith attempt to properly value the Class B stock before forcibly converting the minority Class B holdings into cash, nor did the Board resolve to give the minority stockholders any say in whether the Proposed Transaction was fair to them.

79.     The foregoing defendants either willfully favored the interests of Hays or simply folded under his influence.  In either event, Hays and the other directors breached their fiduciary duties to Company stockholders by employing a deficient process that culminated in the unfair Proposed Transaction.

## COUNT II

### Violation of WBCL § 1141 and Violation of the Articles of Incorporation
### Against NRC, Hays, Martin, Mowry, Nunnelly, and Berwick

80.     Plaintiff repeats and re-alleges each allegation set forth in this Complaint.

81.     The Proposed Transaction violates WBCL § 1141, Wis. Stat. § 180.1141, because it is a restricted "business combination" transaction with an "interested stockholder" and does not comply with the statutory requirements for such a transaction.

WHEREFORE, Plaintiff demands judgment in its favor as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Preliminarily and permanently enjoining defendants from consummating the Proposed Transaction;

C.     Awarding Plaintiff and the Class the amount of damages sustained as a result of Defendants' misconduct;

D.     Awarding Plaintiff and the Class appropriate equitable relief to remedy Defendants' misconduct;

E.     Awarding Plaintiff the cost of this action, including reasonable allowance for attorneys' fees and experts' fees; and

F.     Granting such other and further relief as this court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury of all issues so triable.

Dated: November 15, 2017

By:     *s/ Blake E. Johnson*
Blake E. Johnson, #24158
David D. Cookson, #18681
BRUNING LAW GROUP
1201 Lincoln Mall, Suite 100
Lincoln, NE 68508
Telephone: (402) 261-3475
Facsimile: (402) 261-4517
blake@bruninglawgroup.com
david@bruninglawgroup.com

KESSLER TOPAZ
MELTZER & CHECK, LLP
Eric L. Zagar, *Pro Hac Vice Pending*
ezagar@ktmc.com
Grant D. Goodhart, *Pro Hac Vice Pending*
ggoodhart@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

ANDREWS & SPRINGER, LLC
Craig J. Springer, *Pro Hac Vice Pending*
cspringer@andrewsspringer.com
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Telephone: (302) 504-4957
Facsimile: (302) 397-2681

*Attorneys for Plaintiff*

STATE OF INDIANA         )
                                   )    SS:

COUNTY OF _MARION_   )

### VERIFICATION

I, Anthony Gennaro, Jr., am duly authorized to verify the factual allegations in the above Verified Class Action Complaint. I hereby verify, under oath, that I have read the foregoing Verified Class Action Complaint and that the facts stated therein are true, except for matters stated to be on information and belief, and as to those matters, I believe them to be true.

**I DECLARE AND AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

_____
ANTHONY GENNARO, JR.

SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County aforesaid, this _14_ day of November, 2017.

_____
Notary Public

My Commission Expires: _04/11/2024_

HELMONT HERRERA
NOTARY PUBLIC
SEAL
STATE OF INDIANA
MY COMMISSION EXPIRES APRIL 11, 2024