**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| ANTHONY GENNARO, JR., on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL RESEARCH CORPORATION, MICHAEL D. HAYS, JOANN M. MARTIN, BARBARA J. MOWRY, JOHN N. NUNNELLY, and DONALD M. BERWICK,<br><br>Defendants. | Case No.  CI 17-441 |

**PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Anthony Gennaro ("Plaintiff"), a stockholder of National Research Corporation ("NRC" or the "Company"), seeks to enjoin consummation of a proposed transaction that is presently scheduled to be voted on at a meeting of NRC's stockholders to be held on a to-be-determined date in December, 2017 and completed immediately thereafter.

**I.      INTRODUCTION**

This stockholder class action challenges, *inter alia*, breaches of fiduciary duty by NRC's founder, CEO, director, and controlling stockholder Michael Hays ("Hays") and the other members of the Company's board of directors (the "Board") in connection with their consideration and approval of a proposed recapitalization of the Company.  Pursuant to the proposed transaction, the Company will effectuate: (1) a reverse stock split of the Company's Class B common stock on a 1-for-1,764,560 basis (the "Reverse Split"); (2) a repurchase of the resulting fractional shares of Class B common stock for $53.44 per share in cash (the "Cash Out"); and (3) a forward stock split

1

of the remaining Class B common stock on a 1,764,560-for-1 basis to occur immediately following the Reverse Split and Cash Out (the "Forward Split") (collectively, the "Proposed Transaction").

As alleged in detail in Plaintiff's Complaint, the Proposed Transaction was intended to and will inure solely to Hays' personal benefit by entrenching his control of NRC and preserving his preferential dividend and voting rights to the exclusion of all other stockholders. Hays orchestrated and led the conflicted process by which the Board approved the Proposed Transaction, and the Board did nothing to address or protect against Hays' obvious conflicts of interest, even as Hays demanded that he receive disparate treatment at the expense of NRC's minority stockholders. Hays and his fellow directors breached their fiduciary duties by approving the Proposed Transaction, which is grossly unfair to the minority stockholders and will cause them irreparable harm. In addition, the Proposed Transaction is statutorily prohibited under governing Wisconsin law and *ultra vires* in violation of NRC's articles of incorporation.

As discussed herein, Plaintiff has satisfied all the requirements to obtain a preliminary injunction, which is necessary to avoid the irreparable harm NRC stockholders will suffer as a result of the Proposed Transaction. Accordingly, Plaintiff respectfully requests that the Court order a preliminary injunction in the form submitted herewith.

## II. STATEMENT OF FACTS

NRC is a Wisconsin corporation that maintains its headquarters in Lincoln, Nebraska. Complaint ¶15. According to NRC's filings, the Company provides analytics and information to health care providers to enable them to understand the experiences of health care consumers and design their services to best meet their customers' needs. Complaint ¶15. Hays is the CEO and controlling stockholder of the Company and has continuously held voting control of NRC since he founded the Company in 1981. Complaint ¶16.

Prior to 2013, the Company had a single class of publicly traded common stock. Complaint ¶22. At the behest of Hays, in 2013 the Board approved a recapitalization of NRC's common stock into two classes, Class A and Class B (the "2013 Reclassification"). Complaint ¶22. The newly established Class A common stock carried $1/100^{th}$ of a vote per share, whereas the newly established Class B common stock carried one full vote per share. Complaint ¶23. With respect to dividend rights, the Class A common stock carried the right to receive $1/6^{th}$ of the dividend, if any, paid on the Class B common stock. Complaint ¶23. Thus, following the consummation of the 2013 Reclassification, the Class B common stock carried 6x the dividend rights and 100x the voting rights of the Class A stock.

After the 2013 Reclassification, Hays controlled approximately 26.5% of the Class A common stock (27.7% when including shares owned by a Hays family trust) and 57.7% of the Class B common stock, collectively accounting for approximately 52% of the Company's overall stockholder voting power. Complaint ¶25. Since that time, his control has increased to approximately 54% of total voting stockholder power. Complaint ¶25.

The purported purposes of the 2013 Reclassification were to increase liquidity in the Company's publicly traded common stock, expand the Company's institutional ownership base, and enhance shareholder value and flexibility, but those effects were never achieved. Complaint ¶¶27-28. Instead, the Company's publicly traded common stock has endured persistently low trading volumes, and a significant trading price disparity has developed between the Class A stock and the Class B stock. Complaint ¶28. Accordingly, the Board began discussing ways to address these issues and appointed Hays to lead an evaluation of strategic alternatives. Complaint ¶29.

Relatively early in the process, the Board determined that it would pursue a transaction that would affect only one of NRC's two classes of common stock. Complaint ¶30. Then, sometime

around "late April and early May of 2017," Hays indicated that he wished to be excluded from the Reverse Split and implement the Forward Split -- that is, Hays wanted NRC to cash out all shares of Class B stock except his own, which he wanted to retain.  Complaint ¶30.

Once Hays demanded disparate treatment for his Class B stock, his interests undeniably diverged from those of the unaffiliated stockholders.  The Board, however, did nothing to address the obvious conflict of interest.  Rather, the Board unjustifiably determined *not* to form a special committee of independent directors to negotiate with Hays on behalf of the minority stockholders and inexplicably continued to allow Hays to lead Board discussions relating to the Proposed Transaction.  Complaint ¶ 31.  "As a director and on his own behalf,"[1] Hays was present for and participated in no less than seven meetings at which the Board discussed the Proposed Transaction.  Complaint ¶31.  Hays in fact participated throughout the discussion process, including in a meeting at which the Board determined *not* to condition the Proposed Transaction on approval by a majority of the minority stockholders, and there is no indication that Hays abstained from the final Board vote to approve the Proposed Transaction.  Complaint ¶31.

The Board ultimately approved the Proposed Transaction pursuant to which Hays will become the sole holder of Class B stock, and thus the only stockholder entitled to receive preferential 6x dividend rights and 100x voting rights.  Complaint ¶38.  It will also result in Hays' increasing his voting control of the Company from 54% to approximately 92%, despite the fact that Hays will own only an approximate 33% equity interest in NRC.  Complaint ¶44.

III.   **ARGUMENT**

    A.   **Legal Standard**

---

[1] *See* National Research Corporation Schedule 14A, filed October 30, 2017 (the "Proxy") at 21, 29, and 31 ("Exhibit A").

Pursuant to Fed. R. Civ. P. 65(a), the factors to be weighed in deciding whether to grant a preliminary injunction are (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Gahan ex rel. Gahan v. U.S. Amateur Confederation of Roller Skating*, 382 F. Supp. 2d 1127, 1129 (D. Neb. 2005). The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief. *Kansas City S. Transp. Co. v. Teamsters Local Union #41*, 126 F.3d 1059, 1066 (8th Cir. 1997). Under this test, "no single factor is determinative;" and therefore, "where the movant has raised a *substantial question* and the equities are otherwise strongly in his favor, the showing of success on the merits can be less." *Cox Cable Commc'ns, Inc. v. Simpson*, 569 F. Supp. 507, 516 (D. Neb. 1983). As demonstrated herein, the pertinent factors weigh heavily in favor of preliminarily enjoining consummation of the Proposed Transaction.

**B.    Plaintiff Has Demonstrated a Reasonable Probability of Success on the Merits**

**1.    The Proposed Transaction Violates Wisconsin Law and NRC's Articles of Incorporation**

NRC is incorporated in Wisconsin and is therefore governed by the Wisconsin Business Corporation Law ("WBCL"). Plaintiff asserts, and has a reasonable probability of success on, a claim that the Proposed Transaction violates WBCL § 1141(2) and NRC's Articles of Incorporation (the "Charter").

Section 1141 of the WBCL provides for restrictions on "business combinations" with "interested stockholders." WBCL § 1141(8)(a) defines the term "interested stockholder" to include a stockholder who beneficially owns at least 10% of the voting power of the corporation.

5

*See* WBCL § 1141(8)(a); Charter Article 9(D)(7).[2] Hays, who owns 54% of NRC's stockholder voting power, is an interested stockholder as defined in the statute and Charter.

In both WBCL § 1140(4) and Article 9(D)(4) of the Charter, a "business combination" is defined to include:

> **Any of the following, if the direct or indirect effect is to increase the proportionate share of the outstanding stock of a class** or series or securities convertible into voting stock of the resident domestic corporation or a subsidiary of the resident domestic corporation **beneficially owned by the interested stockholder** or an affiliate or associate of the interested stockholder, unless the increase is the result of immaterial changes due to fractional share adjustments:
>
> 1. **A reclassification of securities, including, without limitation, a stock split, stock dividend or other distribution of stock in respect of stock, or reverse stock split.**
>
> 2. **A recapitalization of the resident domestic corporation.**
>
> 3. A merger or share exchange of the resident domestic corporation with a subsidiary of the resident domestic corporation.
>
> 4. **Any other transaction**, whether or not with, into or involving the interested stockholder, **which is proposed by**, on behalf of, or pursuant to a written or unwritten agreement, arrangement or understanding with, **the interested stockholder** or an affiliate or associate of the interested stockholder.

Wis. Stat. § 180.1140(4)(e) (emphasis added); *see also* Charter Article 9(D)(4). The Proposed Transaction is a business combination as defined in the statue and Charter because it will increase Hays' proportionate ownership of Class B stock, involves both a reverse and forward stock split, and was proposed by Hays, an interested stockholder.

---

[2] Citations to "Charter Article __" refer to the Amended and Restated Articles of Incorporation of NRC.

Both WBCL § 1141(2) and Article 9(B) of the Charter provide that a business combination with an interested stockholder who has been interested for more than three years is impermissible unless any of the following three conditions is satisfied:

(a) The board of directors of the resident domestic corporation has approved, *before the interested stockholder's stock acquisition date*, the purchase of stock made by the interested stockholder on that stock acquisition date;

(b) The business combination is *approved by the affirmative vote of the holders of a majority of the voting stock not beneficially owned by the interested stockholder at a meeting called for that purpose*; or

(c) The business combination meets *all* of the following conditions:

1. *Holders of all outstanding shares of stock of the resident domestic corporation not beneficially owned by the interested stockholder are each entitled to receive per share* an aggregate amount of cash and the market value, as of the consummation date, of noncash consideration at least equal to the higher of the following:

    a. *The highest of: the market value per share on the announcement date with respect to the business combination*, the market value per share on the interested stockholder's stock acquisition date, the highest price per share paid by the interested stockholder, including brokerage commissions, transfer taxes and soliciting dealers' fees, for shares of the same class or series within the 3 years immediately before and including the announcement date of the business combination, or the highest price per share paid by the interested stockholder, including brokerage commissions, transfer taxes and soliciting dealers' fees, for shares of the same class or series within the 3 years immediately before and including the interested stockholder's stock acquisition date; *plus, in each case, interest compounded annually from the earliest date on which that highest per share acquisition price was paid or the per share market value was determined, through the consummation date, at the rate for one-year U.S. treasury obligations from time to time in effect*; less the aggregate amount of any cash and the market value, as of the dividend payment date, of any noncash dividends paid per share since that date, up to the amount of that interest.

    b. The highest preferential amount per share, if any, to which the holders of shares of that class or series of stock are entitled upon the voluntary or involuntary liquidation of the resident domestic corporation, plus the aggregate amount of dividends declared or due which those holders are entitled to before payment of dividends on

>another class or series of stock, unless the aggregate amount of those dividends is included in the preferential amount.

Wis. Stat. § 180.1141(2) (emphasis added); *see also* Charter Article 9(B). The Proposed Transaction cannot satisfy any of the safe harbors under WBCL § 180.1141(2) or Article 9(B) of the Charter, and is therefore prohibited.

First, Hays' acquisition of sufficient shares to become an "interested stockholder" could not possibly have been pre-approved by the Board because Hays has owned more than 50% of the Company's voting power since he founded the Company in 1981.

Second, the Proposed Transaction does not satisfy the requirements of WBCL § 180.1141(2) or Article 9(b)(2) because the Board decided not to put the Proposed Transaction to a vote of the minority stockholders unaffiliated with Hays. Instead, Hays will use his majority voting power to approve the Proposed Transaction by himself regardless of how other stockholders vote.

Finally, the Proposed Transaction does not satisfy the requirements of WBCL § 180.1141(2)(c) or Article 9(b)(3) because the Class B stockholders who are being cashed out are not receiving the statutorily mandated minimum compensation, which is the "market value per share on the announcement date with respect to the business combination." The "market value" of the Class B stock is defined in WBCL § 180.1142 and Article 9(E) of the Charter as:

>***The highest closing sale price during the 30 days immediately before the date in question of a share of that class or series of stock*** on the composite tape for stocks listed on the New York stock exchange, or, if that class or series of stock is not quoted on the composite tape or if that class or series of stock is not listed on the New York stock exchange, on the principal U.S. securities exchange registered under the exchange act on which that class or series of stock is listed.

Wis. Stat. § 180.1142(1)(a)(1) (emphasis added); *see also* Charter Article 9(E)(1)(i).

NRC's Class B common stock trades on the NASDAQ exchange under the ticker symbol "NRCIB," and the highest closing price of the Class B stock within the 30 days preceding the announcement of the Proposed Transaction is $55.60, which occurred on September 13, 2017. Accordingly, $55.60 is the statutorily defined "market value" of Class B stock, but the cash out price is only $53.44, $2.16 less than the statutorily mandated minimum (not including interest as required by the statute).

The foregoing analysis demonstrates that Plaintiff has a reasonable likelihood of success on his claim that the Proposed Transaction violates Wisconsin statutory law and the NRC Charter.

### 2. Defendants Breached their Fiduciary Duties

As directors of NRC (and, with regard to Hays, as NRC's controlling stockholder), Hays and the Board owed NRC stockholders the fiduciary duties of loyalty, good faith and fair dealing. *Modern Materials, Inc. v. Advanced Tooling Specialists, Inc.*, 206 Wis. 2d 435, 442 (Wis. Ct. App. 1996). Further, as a controlling stockholder, Hays personally owed fiduciary duties to the minority stockholders. Data Key Partners v. Permira Advisers LLC, 356 Wis. 2d 665, 691 (Wis. 2014) ("majority shareholders have a very limited fiduciary duty to minority shareholders. Simply stated, majority shareholders cannot use their voting power to require corporate action that grants majority shareholders an improper material benefit at the expense of minority shareholders."). "It has been said that a trust relationship exists between the stockholders and the directors and from this relationship arises the fiduciary duties of the directors toward the stockholders in dealings which may affect the stock and the rights of the stockholders." *Grognet v. Fox Valley Trucking Serv.*, 45 Wis. 2d 235, 241, (Wis. 1969). These duties require corporate directors to act in good faith and deal fairly in the conduct of all corporate business. *Reget v. Paige*, 242 Wis. 2d 278, 288 (Wis. Ct. App. 2001). As fiduciaries, directors cannot use their positions of trust to further their private

9

interests. *Notz v. Everett Smith Grp., Ltd.*, 316 Wis. 2d 640, 653 (Wis. 2009) (citing *Rose v. Schantz*, 56 Wis. 222, 228 (Wis. 1972)).

It is well established that corporate directors have a duty to oversee and manage conflicts of interest in their dealings with the corporation. *See RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 855 (Del. 2015) (noting it is the board's responsibility to "be active and reasonably informed when overseeing the sale process, including identifying and responding to actual or potential conflicts of interest."); *see also In re Rural Metro Corp.*, 88 A.3d 54, 90 (Del. Ch. 2014) ("Another part of providing active and direct oversight is acting reasonably to learn about actual and potential conflicts faced by directors, management, and their advisors").[3] When a conflict of interest arises between a controlling stockholder and the minority stockholders, especially where the controller is being treated differently in a corporate transaction that affects all stockholders, boards typically form a special committee of disinterested and independent directors to represent the interests of the minority stockholders.[4] The purpose of the special committee is to replicate as closely as possible an arm's length bargaining process in situations where the controlling stockholder occupies a uniquely advantageous position. *See In re Ezcorp Inc. Consulting*

---

[3] Wisconsin courts often look to Delaware law for guidance on matters of corporate law. *See, e.g.*, *Lane v. Sharp Packaging Sys., Inc.*, 251 Wis. 2d 68, 127 (Wis. 2002); *Notz v. Everett Smith Grp., Ltd.*, 316 Wis. 2d 640, 664 (Wis. 2009) ("Delaware, a jurisdiction to which Wisconsin courts often look for "guidance on corporate law"); *HMO-W Inc. v. SSM Health Care Sys.,* 234 Wis.2d 707 (following Delaware law in rejecting application of minority discount in determining "fair value" in dissenters' rights proceeding); *Jacobson v. American Tool Companies,* 222 Wis.2d 384, 397 (Wis. Ct. App. 1998) (looking to Delaware law to define fiduciary duties); *Advance Concrete Form, Inc. v. Accuform, Inc.,* 158 Wis. 2d 334, 344 (Wis. Ct. App. 1990) (citing Delaware cases to determine whether request to inspect corporate documents was for a "proper purpose"); *Schweiner v. Hartford Accident & Indem. Co.,* 120 Wis.2d 344, 351 (Wis. Ct. App. 1984) (citing Delaware law for effect of statutory merger on liabilities of merger corporation).

[4] *See, e.g., Kahn v. Tremont Corp.*, No. CIV. A. 12339, 1992 WL 205637, at *3 (Del. Ch. Aug. 21, 1992) ("The device of the special committee of the board is one that has in recent years come to be widely employed. There is great utility in this device.").

*Agreement Derivative Litig.*, No. CV 9962-VCL, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006) ("the goal of the [special committee] process established by the board of the subsidiary must be to come as close as possible to simulating arm's-length bargaining with the parent.").

The Proposed Transaction, which will make the Hays the sole owner of Class B stock, provides Hays with uniquely favorable treatment compared to the unaffiliated minority stockholders. Indeed, Hays demanded such differential treatment sometime around "late April and early May of 2017." Hays' interests unequivocally diverged from those of the unaffiliated minority stockholders who would be cashed out of the Company without their consent, while Hays alone would retain Class B shares entitling him to 6x dividend rights and 100x voting rights. The Board, however, did nothing to address Hays' conflict of interest. The Board did not form a special committee of independent directors to represent the interests of the minority stockholders and negotiate with Hays regarding the terms of the Proposed Transaction, nor did the Board push back on Hays' demand for unequal treatment. Instead, the Board simply accepted Hays' demand and permitted him to continue to participate in and control the discussions, both "as a director and on his own behalf." Further, the Board declined to condition the Proposed Transaction on the approval of a majority of the unaffiliated stockholders,[5] and instead allowed Hays to dictate the outcome by voting his controlling stake in favor of the Proposed Transaction. Hays' use of his position as a director and controlling stockholder of NRC to benefit himself, and his fellow directors' failure to engage in a fair process to protect the interests of the minority stockholders,

---

[5] *See, e.g., In re John Q. Hammons Hotels Inc. S'holder Litig.*, No. CIV. A. 758-CC, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) ("The majority of the minority vote, however, provides the stockholders an important opportunity to approve or disapprove of the work of the special committee and to stop a transaction they believe is not in their best interests.").

was a breach of their respective fiduciary duties, and Plaintiff has a reasonable probability of success on these claims. *See Sealy Mattress Co. of New Jersey v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (noting that "in carrying out its affirmative duty to protect the interests of the minority, [a board] could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder, particularly where, as here, the majority stockholder's interests were in unalloyed conflict with the minority.").

### C. Plaintiff Will Suffer Irreparable Harm Absent an Injunction

A party moving for a preliminary injunction is required to show the threat of irreparable harm absent an injunction. *Baker Elec. Co-op., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Barrett v. Reynolds*, No. 8:12-CV-328, 2012 WL 5569755, at *4 (D. Neb. Nov. 15, 2012).

As discussed above, the Proposed Transaction is prohibited by Wisconsin statutory law and NRC's Charter. Accordingly, consummation of the Proposed Transaction will constitute irreparable harm. Once the Proposed Transaction is effected, Class B minority stockholders will be forever cashed out of the Company, making it impossible to "unscramble the eggs." *See, e.g., Catamaran Acquisition Corp. v. Spherion Corp.*, 2001 WL 755387, at *4 (Del. Sup. Ct. May 31, 2001); *ODS Technologies, L.P. v. Marshall,* 832 A.2d 1254, 1263 (Del. Ch. 2003). Thus, Plaintiff easily satisfies the irreparable harm requirement for a preliminary injunction.

### D. The Balance of Equities Favors Granting an Injunction

To obtain a preliminary injunction, a plaintiff must also demonstrate that the state of balance between the irreparable harm and the injury that granting the injunction will inflict on other parties litigant tips in favor of granting a preliminary injunction. *Gahan ex rel. Gahan v. U.S. Amateur Confederation of Roller Skating*, 382 F. Supp. 2d 1127, 1129 (D. Neb. 2005).

In the case at bar, the balance of equities clearly favors Plaintiff. In contrast to the irreparable harm that Plaintiff and all NRC minority stockholders will suffer if the Proposed Transaction is consummated, a preliminary injunction will cause Defendants nothing more than the minor inconvenience of postponing completion of the Proposed Transaction pending resolution of Plaintiff's claims. There is no risk to the Proposed Transaction in the unlikely event Plaintiff's claims are unsuccessful, as Hays will continue to control NRC after the litigation and can effectuate the Proposed Transaction whenever he chooses.

### E. A Preliminary Injunction Serves the Public Interest

The final factor in the analysis is the impact of granting or denying the preliminary injunction upon the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981). The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious. *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1249 (N.D. Iowa 1995). Here, it is in the public interest to grant the preliminary injunction because it serves the public interest to ensure that officers and directors of corporations adhere to their statutory and fiduciary obligations. *See, e.g.*, *Sample v. Morgan*, 935 A.2d 1046, 1062 (Del. Ch. 2007) (holding that public interest would not be served by allowing breaches of fiduciary duty to go uncorrected).

### IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion for preliminary injunction.

Dated: November 15, 2017

By:   *s/ Blake E. Johnson*
Blake E. Johnson, #24158
David D. Cookson, #18681
BRUNING LAW GROUP
1201 Lincoln Mall, Suite 100
Lincoln, NE 68508
Telephone: (402) 261-3475
Facsimile: (402) 261-4517
blake@bruninglawgroup.com
david@bruninglawgroup.com

KESSLER TOPAZ
MELTZER & CHECK, LLP
Eric L. Zagar, *Pro Hac Vice Pending*
ezagar@ktmc.com
Grant D. Goodhart, *Pro Hac Vice Pending*
ggoodhart@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

ANDREWS & SPRINGER, LLC
Craig J. Springer, *Pro Hac Vice Pending*
cspringer@andrewsspringer.com
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Telephone: (302) 504-4957
Facsimile: (302) 397-2681

*Attorneys for Plaintiff*